**Paul G. SHULTZ, Plaintiff–Appellant,**

v.

**DEPARTMENT OF ARMY, UNITED STATES OF AMERICA, Defendant–Appellee.**

Nos. 92–35197, 92–35580.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 3, 1993.

Decided Nov. 30, 1993.

Joseph W. Sheehan, Fairbanks, AK, for plaintiff-appellant.

William B. Lazarus, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for defendant-appellee.

Before: SCHROEDER, FLETCHER and ALARCON, Circuit Judges.

## OPINION

FLETCHER, Circuit Judge:

Paul G. Shultz appeals the district court's judgment in favor of the government in his action to quiet title under 28 U.S.C. § 2409a

to a public right (or rights) of way across Fort Wainwright. He argues that the district court erred in finding that no rights of way existed within the meaning of 43 U.S.C. § 932 ("RS 2477 rights of way"),[1] or that, if they did exist, his cause of action, nonetheless, was barred under 28 U.S.C. § 2409a(g) (the statute of limitations for quiet title actions). In the alternative, Shultz contends that even if no RS 2477 right of way existed prior to the Army's acquisition of land, the Army took the land subject to other forms of easements that provided public passage. The district court had jurisdiction under 28 U.S.C. § 2409a (Quiet Title) and 28 U.S.C. § 1331 (Federal Question). Our jurisdiction rests on 28 U.S.C. § 1291 (Final Judgments).[2]

■ As a threshold matter, the Army appears to press a challenge to the district court's jurisdiction by questioning Shultz's standing to litigate all but the roads abutting his property. Tr. I at 28, 30. It disputes whether Shultz has a "special and vital interest" in roads that do not abut his property. *See State v. Nolan,* 191 P. 150 (Mont.1920); *see also Hudson v. American Oil Co.,* 152 F.Supp. 757, 767–68 (E.D.Va.1957), *aff'd,* 253 F.2d 27 (4th Cir.1958) ("[a]s complainants are not abutting landowners, it is difficult to conceive how any special injury may be shown, as contrasted with an injury to the general public"); *Wernberg v. State,* 516 P.2d 1191, 1201 (Alaska 1974) ("a landowner has a private property right of access to an abutting public street"). The argument is without merit. Shultz clearly meets the criteria for standing outlined in *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). *See also Central Arizona Water Cons. Dist. v. EPA,* 990 F.2d 1531, 1537 (9th Cir.1993). First, he has a "particularized" interest in crossing the base to reach roads that lead to his property.

Not to have access to those roads would "affect [him] in a personal and individual way" by sealing him off from his property. *Lujan,* —— U.S. at —— n. 1, 112 S.Ct. at 2136 n. 1. Second, Shultz seeks to quiet title as against the Army which asserts an unrestricted right to regulate access to Fort Wainwright's roads.[3] A clear causal connection exists between his claim and the restrictions he challenges. Finally, were Shultz able to prove that the combination of roads leading to his property do constitute public rights of way the "favorable decision" would redress the injury he asserts. The district court correctly permitted the record to be developed fully.

■ A district court's factual findings are reviewed for clear error. Fed.R.Civ.P. 52(a). Its conclusions of law are subject to de novo review. Factual findings and conclusions concerning the events that may trigger the running of the statute of limitations present "a mixed question of fact and law reviewed for clear error." *Shultz v. Department of Army,* 886 F.2d 1157, 1159 (9th Cir.1989). We must accept the district court's factual findings unless upon reviewing "the entire evidence [the court] is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *United States v. Ramos,* 923 F.2d 1346, 1356 (9th Cir.1991).

## I.

Shultz owns property to the northeast of Fort Wainwright and east of Fairbanks. To get to Fairbanks, he must cross the base. Fort Wainwright is situated on land acquired by the federal government in a series of purchases and withdrawals beginning in 1937. All of the acquisitions were made

---

**1.** 43 U.S.C. § 932 reclassified R.S. 2477 as first enacted by the Act of July 26, 1866, Ch. 262, § 8, 14 Stat. 251, 253 (1866) (repealed 1976).

**2.** Shultz filed two notices of appeal. The first, docketed as No. 92–35197, appealed the district court's judgment of January 13, 1992. The second, No. 92–35580, appealed the amount of costs assessed against him by the district court's clerk. We make no determination regarding our juris-

diction to hear Shultz's costs appeal. Our decision renders that appeal moot.

**3.** In a letter of August 24, 1991, the Acting Provost Marshall of Fort Wainwright threatened to bar Shultz from crossing the base. Defendant's Exhibit AQ ("Any deviation from this route or procedures without prior approval will result in total barment from post").

"subject to valid existing rights." Shultz traces his title through George Nissen who homesteaded in the first half of the century and through Nissen's successors. Nissen was a German immigrant who made entry on the property in October 1907, built his cabin the following month and, by February 1908, established residency. He was among a handful of homesteaders occupying land along the Chena River and for a while raised potatoes and other vegetables with great success. He transported a portion of his crop to market in Fairbanks every year. Nissen left the area in 1918. The homestead patent, for which he had filed in 1914, was issued in 1924.

In the early days of homesteading the routes to Fairbanks across present-day Fort Wainwright were difficult to travel. At trial one witness described swimming horses in the summer across sloughs lacking bridges. These same sloughs served as frozen highways in the winter. Much of the land surrounding Shultz's property, especially to the north, is swampy, due to the underlying permafrost that prevents the melted snow from draining. In Alaska, more than in most locations, the season dictates the nature and means of passage. The trial involved the introduction of extensive evidence of the various historical routes across the land now occupied by the Army. The routes particularly examined by the district court essentially follow along two physical features of the land, the Chena River to the south, and the hills (Beacon, Bald, Sage) to the north. Trainer Gate Road feeds into the network from Fairbanks. River Road, also known as Tank Road, continues from Trainer Road along the northern bank of the Chena River, ultimately to Homestead Road which leads to Shultz's property. These roads make up the modern route that follows roughly the river from Fairbanks across Fort Wainwright.[4] In part they follow the same course as the trails and wood paths used by early settlers in the Chena River area. While roads skirting the hills to the north also afforded settlers access to Fairbanks, only the river route is travelled today.

In 1981 the Army instituted a pass system for vehicles entering or crossing the base, requiring passes at Trainer Gate Road. When Shultz did not present a pass, the Army refused him entry. No other land route is available. Without access through Fort Wainwright, Shultz is landlocked. Hemmed in by Fort Wainwright to the east and the Chena River to the south, the property cannot be developed or subdivided.

Shultz filed a complaint in 1986· seeking access across Fort Wainwright as a matter of right. (First Amended Complaint). The district court granted the Army summary judgment on statute of limitations grounds, 28 U.S.C. § 2409a(g). We reversed and remanded. *Shultz v. Department of Army*, 886 F.2d 1157 (9th Cir.1989). We concluded that further factual development was required to determine whether the statute of limitations had run on Shultz's quiet title action. *Id.* at 1161. On remand, the judge held a bench trial during which he questioned the parties' expert witnesses extensively, and pored over maps of the area as they were explained to him. Ultimately finding that none of the six roads Shultz put forward were RS 2477 public rights of way, or public easements otherwise established, the district court entered judgment in favor of the Army. He also found that the quiet title actions on four of the roads were barred by Section 2409a(g). Shultz appealed.[5]

## II.

The Army withdrew the land now occupied by Fort Wainwright "subject to valid existing rights" including any then-existing easements. *Shultz*, 886 F.2d at 1159. Before the district court, Shultz sought to show that an

---

**4.** The parties disagreed at trial and again on appeal as to how to describe and name the roads making up this route. The district court made separate findings regarding Wiest Road, which no longer forms a distinct part of the Trainer–River–Homestead Roads network. District Court's Findings (DCF) 7–24. On cross-examination, a government witness explained that River Road makes a bend north of the Chena river and "Homestead Road ... takes off from that bend and goes to the east." Tr. III at 97. A sign marked "Homestead Road" stands at the intersection. *Id.*

**5.** *See supra* note 2.

easement, whether of RS 2477 or common law origin, predated the Army's acquisition of the Fort Wainwright landholding. He argued that under one theory or another, or several combined, he was entitled to cross the base to reach his property.

We must determine whether the district court was correct in holding that the property owners who must cross Fort Wainwright to reach their property have no right of passage either because none existed at the time of the Army's acquisition of the military reserve or because the Army's subsequent actions cut off the right. Our decision must take into account the fact that conditions in Alaska present unique questions, not easily answered.

 Due to its geography, its weather, and its sparse and scattered population, Alaska's "highways" frequently have been no more than trails[6] and they have moved with the season and the purpose for the transit— what travelled best in winter could be impassable knee-deep swamp in summer; what best accommodated a sled was not the best route for a wagon or a horse or a person with a pack. By necessity routes shifted as the seasons shifted and as the uses shifted. What might be considered sporadic use in another context would be consistent or constant use in Alaska. We conclude that as long as the termini of the right of way are fixed (the homesteaders' cabins on one end, Fairbanks on the other), to establish public right of way the route in between need not be absolutely fixed (as it might be in other settings). The law recognizes as much. Based on that premise, the questions we must decide are: (1) was there evidence that the homesteaders' usual routes between Fairbanks and the homesteads in 1937 lay across the land that was acquired for Fort Wainwright? (2) If so, did the Army take action and take it at a time that has cut off their right to use the routes? We note that the Army and its residents east of the base have coexisted for several decades. Everyone appears satisfied with the single route

currently used by the public to cross the base. Right of access is the issue, not the route. A decision finding a public right of way to cross Fort Wainwright, though grounded in the recognition of various historical routes, should not preclude a limitation on that right to the single recognized route currently in use.

With this preamble in mind, we turn to the district court's legal analysis and its application to the evidence.

## A. *RS 2477 Right of Way*

 From 1866 until its repeal, 43 U.S.C. § 932 (R.S. 2477) granted a "right of way for the construction of highways over public lands, not reserved for public uses." 43 U.S.C. § 932 *repealed by* Federal Land Policy Management Act of 1976, § 706(a), Pub.L. No. 94–579, 90 Stat. 2793.[7] The grant is "self-executing." *Standard Ventures, Inc. v. Arizona,* 499 F.2d 248, 250 (9th Cir.1974); *see also Sierra Club v. Hodel,* 848 F.2d 1068, 1083–84 (10th Cir.1988). An RS 2477 right of way comes into existence "automatically when a public highway [is] established across public lands in accordance with the law of the state." *Standard Ventures,* 499 F.2d at 250; *see also Sierra Club,* 848 F.2d at 1078 (citing 43 C.F.R. § 244.55 (1939)). Whether a right of way has been established is a question of state law. *Standard Ventures,* 499 F.2d at 250; *Fisher v. Golden Valley Elec. Ass'n, Inc.,* 658 P.2d 127, 130 (Alaska 1983) (citing *United States v. Oklahoma Gas & Elec. Co.,* 318 U.S. 206, 209–10, 63 S.Ct. 534, 535–36, 87 L.Ed. 716 (1943)). The resolution of any particular claim turns upon a highly factual inquiry. *Standard Ventures,* 499 F.2d at 250. "Any doubt as to the extent of the grant must be resolved in the government's favor." *Humboldt County v. United States,* 684 F.2d 1276, 1280–81 (9th Cir.1982).[8]

 Under Alaska law, two methods of establishing an RS 2477 right of way have been recognized:

[B]efore a highway may be created, there must either be [1] some positive act on the

---

6. *See* R.S. 19.45.001(9).

7. All rights of way existing on the date of repeal were expressly preserved. 43 U.S.C. § 1769.

8. The scope of an RS 2477 grant is also subject to state law. *Sierra Club,* 848 F.2d at 1079–83.

part of the appropriate public authorities of the state, clearly manifesting an intent to accept the grant, or [2] there must be public user for such a period of time and under such conditions as to prove that the grant has been accepted.

*Hamerly v. Denton,* 359 P.2d 121, 123 (Alaska 1961); *see also Dillingham Commercial Co., Inc. v. City of Dillingham,* 705 P.2d 410, 413–14 (Alaska 1985); *Alaska v. Alaska Land Title Ass'n,* 667 P.2d 714, 722 (Alaska 1983); *Girves v. Kenai Peninsula Borough,* 536 P.2d 1221, 1226 (Alaska 1975), *overruled on other grounds,* 618 P.2d 567, 569 n. 4 (Alaska 1980). To prove RS 2477 rights by the second of these methods, a claimart must show "(1) that the alleged highway was located 'over public lands,' and (2) that the character of its use was such as to constitute acceptance by the public of the statutory grant." *Hamerly,* 359 P.2d at 123.

■ Alaska law, consistent with Alaska's circumstances, does not place a burdensome requirement on RS 2477 claimants regarding the nature of the "highway," whether established by dedication or public use. It broadly defines "highway" to include a "road, street, trail, walk, bridge, tunnel, drainage structure and other similar or related structure or facility, and right-of-way thereof." A.S. 19.45.001(9) (1988); *cf.* 48 U.S.C. § 321d (repealed 1959) (similar definition). It is necessary to establish that the road traverses public land because an RS 2477 right of way may be created only while the "surrounding land [retains] its public character." *Adams v. United States,* 3 F.3d 1254, 1258 n. 1 (9th Cir.1993); *see also Humboldt County,* 684 F.2d at 1281.

> If the conditions were such that the lands were not public lands—having been taken up under homestead applications—then the congressional grant was not in effect. Public use of the road would be of no avail since there would be at that time no offer which the public could accept. The fact that the entries were later relinquished or cancelled would not change the condition[s].

*Hamerly,* 359 P.2d at 124; *see also Dillingham,* 705 P.2d at 414. Valid pre-existing claims upon the land traversed by an alleged right of way trump any RS 2477 claim. As the *Dillingham* court put it, "[i]t is clear that the public may not, pursuant to § 932 acquire a right of way over lands that have been validly entered." *Dillingham,* 705 P.2d at 414. Homesteading rights clearly are superior to later established RS 2477 claims. Territory validly withdrawn for other purposes also falls within the *Dillingham* rule. Thus, when Congress set aside land for the support of territorial schools, the sections it named from each township no longer were available public lands. Act of March 4, 1915, ch. 181, §§ 1–2, 38 Stat. 1214, 48 U.S.C. § 353 (repealed by Pub.L. No. 85–508, § 6(k), 73 Stat. 343 (1958)) (withdrawing all township sections numbered 16 and 36 for schools unless "settlement with a view to homestead entry ha[d] been made upon any part of the sections reserved hereby before the survey thereof in the field"). *Cf. Mercer v. Yutan Constr. Co.,* 420 P.2d 323, 324, 325–26 (Alaska 1966) (grazing land "public" because grazing permit subordinate to public right of way).

■ The *Hamerly* line of cases sets the standard for the other condition: whether a trail has been frequented by "public users for such a period of time and under such conditions as to prove" that a public right of way has come into existence. *Hamerly,* 359 P.2d at 123; *see also Dillingham,* 705 P.2d at 413–14; *Alaska Land Title,* 667 P.2d at 722; *Girves,* 536 P.2d at 1226. Continuous use is not a requirement. *Cf. McGill v. Wahl,* 839 P.2d 393, 397 (Alaska 1992) ("[t]o establish a prescriptive easement a party must prove that (1) the use of the easement was continuous and uninterrupted"). Although the law of RS 2477 rights of way suggests that "infrequent and sporadic" use is insufficient, *Hamerly,* 359 P.2d at 125, and that "regular" and "common" use by the public is necessary, *Kirk v. Schultz,* 63 Idaho 278, 119 P.2d 266, 268 (1941), and that travel across the route may not be "merely occasional," the test is what is "substantial" *under the circumstances, Ball v. Stephens,* 68 Cal.App.2d 843, 158 P.2d 207, 210 (1945). Courts must look to the circumstances as they existed at the time of establishment. In California, a court noted that "travel over [a

claimed RS 2477 right of way] ... was irregular but that was due to the nature of the country and to the fact that only a limited number of people had occasion to go that way." *Ball*, 158 P.2d at 211. Such circumstances are not unlike Alaska's where we conclude a few homesteaders traversing difficult terrain, in difficult climatic conditions may lay claim to an RS 2477. An existing right of way recognized as such, primitive at its conception, may evolve from trail to road as frontier conditions give way to modernization. *Id.* at 210 ("[t]he route was used first as a trail, later by horse-drawn vehicles, and went through a gradual process of occasional improvement and use until it became a road suitable for automobiles and trucks"). The route, no matter how rudimentary must, however, for RS 2477 purposes, have "definite termini." *Dillingham*, 705 P.2d at 414. Trails "running into wild, unenclosed and uncultivated country" do not meet the minimum standard of definiteness (they lack one terminus) nor do they suggest sufficient public use. *Id.* In rejecting claims arising from "desultory" use, the Alaska Supreme Court was influenced by the fact that those particular claimants "had no real interest in lands to which [their claimed RS 2477] gave access." *Hamerly*, 359 P.2d at 125.

The district court in this case found that Homestead Road[9] did not amount to an RS 2477 right of way because no road broad enough to accommodate a wagon cut across present day Fort Wainwright before the surrounding land was validly withdrawn from the public domain. DCF 29, 36, 39, 41. Whether factually correct or not, the court imposed an overly stringent standard. An otherwise qualifying trail is all that would be required. Further, to reach this conclusion the district court drew some impermissible inferences. It frequently pointed out that

Nissen used the river to transport his crops rather than using an overland trail and, apparently, inferred from this that no trail existed. DCF 28, 40; *see also* Tr. V at 68. It noted that Nissen, like some other neighboring homesteaders, built his cabin on the river and that the river, in contrast to the alternative available land routes, was the most convenient, and the only viable means to transport his crop to market. DCF 28, 33, 40.

Even under the deferential standard of review due to the finder of fact, we cannot agree that sufficient evidence supports either inference—that Nissen used the river to transport his crop or that there was no overland trail. There was no evidence that Nissen owned a boat or that he ever travelled by boat. The Government Land Office's on-site investigation of his homesteading claim reported no boat or dock on the property. It did report that he had a stable, suggesting he owned a horse. A neighbor across the river said that he himself did not have a boat. There was evidence that Nissen possessed a "garden truck." The Chena River flows downstream into Fairbanks, and is very shallow in places. To return upstream seven "river miles" from Fairbanks is problematic. Tr. V at 50. While the district court's inference relies on "the convenience of down river travel," the court acknowledged that the upriver return would be taxing. DCF 28; Tr. V at 50, 68.

■ The district court's factual findings regarding lack of overland transport, travel and trail at best are based on supposition, not permissible inference from fact. This obviously contributed to its erroneous legal conclusions. But entirely apart from the erroneous factual findings, it misunderstood the requirements to establish a public right

---

9. The parties disagree over how to name or specify this road, *see supra* note 4. Shultz asserts that Homestead and Wiest Roads must be considered together because they coincide in places or run into each other. Appellant's Opening Br. at 20, 31–32; Tr. I at 4; *see also* Respondent's Br. at 23. The district court found that the two roads do not "correspond ... or overlap" and treated them separately. DCF 23; *but see* DCF 36. Since the law recognizes that routes may evolve, *Ball*, 158 P.2d at 210, there is no requirement that the historical route and its current

location coincide exactly. Here, parts of the historical road were "obliterated" by the construction of the modern throughway. Tr. III at 137; Tr. IV at 69. Other parts of the road disappeared in the face of an encroaching Chena River. Tr. IV at 69–70. Particularly in Alaska, it makes little sense to insist on a formal identity between the modern and historical routes. The judge's factual findings regarding the precise relationship between the trail Nissen took and modern Homestead Road are irrelevant under the law.

of way. The district court seemed to think the transportation of crops, and use of a wagon were crucial to establishing an RS 2477 right of way. In analyzing Nissen's *use* of Wiest Road, it noted that the use was "not for regular transport of his crops." DCF 38. As a legal matter, the barest foot trail may qualify for RS 2477 status. A.S. 19.45.001(9) (1988); *Ball*, 158 P.2d at 210 (mountain trail). The condition of the "highway"—whether paved and wagon-worthy, or simply a "minor footpath"—is irrelevant if the claimant can show that the right of way was used no matter for what purpose. A handful of homesteaders pushing the boundaries of the Alaskan frontier in inhospitable territory put a path to substantial use merely by traveling to and from town and each other's homesteads. *Ball*, 158 P.2d at 211; *see also Dillingham*, 705 P.2d at 415 (road "may be used for *any* purpose consistent with public travel") (emphasis added).[10] Even if Nissen did not use the trail to carry his vegetables into market by wagon, there can be no doubt that he had a "real interest in the lands to which [a trail] gave access," a route between his home, a homesteader's lot under cultivation (not wild country), and Fairbanks, the nearest outpost of civilization. *Hamerly*, 359 P.2d at 125. The right of way was no less a right of way early on because only later it evolved to accommodate wagons and cars (¶¶ 39, 41.37). As we have noted the *manner* of travel (by foot or beast or vehicle) is legally irrelevant to the RS 2477 determination. What matters is that there was travel between two definite points.[11]

To the extent that the district court's findings collectively suggest that overland travel was so inconvenient as to justify the conclusion that travel was by river only, the conclusion is based on sheer supposition, not evidence, circumstantial or otherwise. The conclusion may be driven in part by the erroneous legal requirement superimposed on the facts. The record discloses that Nissen had available land routes to take his produce to market by wagon, by sled, by cart or on his back. He could avoid crossing the Columbia Slough which lay between the Wiest and Nissen homesteads by taking passage around Approach Hill and there were means even across the slough, over the ice in winter, swimming horses in summer. Why his taking produce to market by wagon should be critical to the establishment of an RS 2477 right of way is never explained, simply assumed.

The court makes a curious finding that simple use (the threshold requirement for RS 2477 claims) of *one* of the overland trails—Wiest Road—did not occur until around 1918, some 11 years after Nissen entered his homestead (DCF 36). The court does not make the finding that there was *no* overland travel before 1918, only that *"[b]y 1918*, Nissen sometimes *used Wiest Road* to get to Fairbanks, but not for regular transport of his crops." (DCF 36) (emphasis added). Wiest arrived in 1910 and built three miles of road sometime over the next several years. Obviously, Nissen's overland travel would have involved a trail that predated the Wiest Road since he arrived in 1907. The district court's finding does not support an inference that he traveled by river, nor does it justify the presumption that no trail existed.[12]

This is not a case where "[t]here simply was no evidence that would have allowed the [district] court to conclude that before [1937]

---

10. The Army's brief highlights one of the legal confusions at play in this case. It argues that "[t]here plainly is no basis for concluding that there was a road to Nissen's property through Wiest's property that pre-dated Wiest's homestead, given that Wiest himself had to build three miles of road to his homestead." Respondent's Brief at 29. Both the judge and the Army clearly misunderstood the import of A.S. 19.45.001(9) for RS 2477 law. Such a right of way need not be "buil[t]" or "constructed" (DCF 41). Nor need it be "susceptible to wagon or motor vehicle use" (DCF 39). An unimproved, unpaved trail suffices as a "road" for the purposes of this law.

11. The government posed the problem incorrectly. It argued to the court that "if you're going to find an RS 2477, you have to know not only *that* he got from Fairbanks to his property, but *how* he did it." Tr. V at 79 (emphasis added). As long as it is clear that Nissen traveled overland, how he did it is immaterial.

12. This inference of course was critical to the court's holding that no right of way existed. "No road, no R.O.W." was the logic.

the public used [historical trails] in such a manner as to accept the § 932 grant." *Dillingham*, 705 P.2d at 415. The evidence was to the contrary. The district court's own factual findings establish that a trail was established in the early days of Nissen's residency. The district court acknowledged the presence of a significant number of homesteaders along the Chena River (DCF 12) all of whom presumably made their way back and forth between each others' properties and town.[13] It acknowledged the existence of a footbridge on Nissen's property suggesting a foot trail (DCF 35) leading west to Fairbanks. Tr. III at 10–11. Indeed, in the face of numerous affidavits noting frequent travel,[14] the district court found that Nissen *used* Wiest Road (DCF 36); he just thought it *inadequate use* occurring too late. The district court never found that no trail or road existed during the critical time.[15] What it did find—that Nissen used the river to transport his crops and that he did not use one of the roads until 1918—has no founda-

tion in the record. All the evidence points to the existence of a publicly used land route between the Nissen homestead and town.

■ Our analysis, however, cannot end simply with the conclusion that the publicly used route existed. To qualify as an RS 2477 the route must have crossed public land, not withdrawn or reserved prior to its establishment.[16] The court found that the territorial schools reservation of 1915 and Wiest's filing of a homestead application in 1914 withdrew from the public domain a segment of the land through which the trail passed. DCF 43, 44. These findings do not preclude an RS 2477 right of way from earlier vesting or affect the existence of other parts of an RS 2477 along other parts of the trail. Specifically, they do not preclude a determination that Nissen made sufficient use of the overland trail in the window of time available to him to establish an RS 2477 superior (because prior in time) to either the territorial schools' reservation or Wiest's homesteading rights.[17]

---

13. The government's own witness drew an apt inference while testifying regarding the existence of trails. "No surprise there," he observed, "wherever we see buildings, we see a trail coming." Tr. III at 153.

14. The judge questioned counsel for the Army on this point. The answer he received supported the affidavits as to both overland travel and public use.
Court: What do you make of the testimony by Sabin that he frequently saw Nissen coming and going?
Mr. Landon: I don't doubt that. And, I would say that he likely, and not necessarily all that infrequently, went to town.... [I]t's not impossible that he walked to town, the distance isn't that great.... [H]e could have easily ridden to town.... [or] mushed [by dogsled] to town.
Tr. V at 70.

15. Everything in the record supports the fact there was a trail and that the trail Nissen allegedly used was passable year-round. Tr. II at 90. Nothing is inconsistent with it. At the very least the Columbia slough could be swum in summer, the ice traversed in winter (DCF 31). The finding that no bridge could be detected in the 1938 aerial photographs (DCF 29) is not inconsistent with Shultz's assertion that one likely existed prior to Nissen's departure in 1918. Parts of the record created by the Army establish that bridges can be washed out. Defendant's Exhibit DV (noting bridge washed out in the spring). The settler who swam his horses across the slough testified to doing so after 1918 (DCF 31). If a

bridge did afford convenient passage across the slough with a wagon (DCF 33), no other finding precludes the possibility that such travel occurred. It may be true that no evidence of a "clear" wagon road was visible on the 1938 aerial photograph, but nothing in the record precludes this finding.

The judge did find that "[i]f a trail or road had existed to Nissen's homestead in 1911, it is unlikely that the section line calls of the survey ... would have missed it." (DCF 38). However, the very witness testifying to the reliability of call lines acknowledged that there could be a "minor footpath ... that was very hard to see, it's possible to miss." Tr. III at 141–42. He only assured the judge that "major roads" would unlikely go unnoticed by surveyors walking the section lines. *Id.* at 141. As Shultz pointed out, the call notes missed other established routes. Tr. V at 145.

16. Under *Hamerly* and *Dillingham*, a claimant has a limited time frame in which to prove use. *Hamerly*, 359 P.2d at 123–25 (analyzing "gaps in the possession of the land"); *see also Dillingham*, 705 P.2d at 414 (applying *Hamerly* analysis).

17. The district court's findings suggest that the gap closed no later than 1914 when Wiest filed his homesteading claim. Under Alaska law, land is withdrawn from the public domain when a homesteader enters his homestead, not when he files his claim or receives the patent. *Hamerly*, 359 P.2d at 123 ("[w]hen a citizen has made a valid entry under the homestead laws, the portion covered by the entry is then segregated from

We do not suggest that every segment of the trail qualified for RS 2477 status, either because a homesteading claim clearly displaced that portion of the claimed RS 2477 right of way,[18] or because there might be homesteading rights that would trump an RS 2477 claim.[19] But that concession does not justify the district court's blanket finding that no RS 2477 existed across present-day Fort Wainwright.

### B. *Other Easements*

For Shultz to prove that the Army took possession of Fort Wainwright subject to other existing property rights, does not require him to prove that the right of way he asserts against the Army is wholly based on one property law theory or another. *See Dillingham,* 705 P.2d at 413. All he was obliged to show was that the homesteaders to the east of Fairbanks used as a matter of right some road, trail or footpath to cross the land before it was acquired by the Army.

Shultz offered a number of common law theories to support his position that the Army took land burdened by pre-existing rights. In response on formulating his ultimate legal conclusions the district court determined that Shultz had "failed to prove the existence of any RS 2477 right-of-way *or other right-of-way* across Fort Wainwright which either alone or in combination with other rights-of-way provide access to [his] property." DCF 91 (emphasis added). As

to other possible bases for a right of way, this finding amounts to little more than a declaration. We can identify no factual finding, for example, that would support the conclusion that no public prescriptive easement was established by 1937.[20] All the evidence is to the contrary.

■ Under Alaska law "public easements may be acquired by prescription." *Dillingham,* 705 P.2d at 416 (citing 2 J. Grimes, *Thompson on Real Property* § 342, at 209 (1980)). "To establish a prescriptive easement a party must prove that (1) the use of the easement was continuous and uninterrupted; (2) the user acted as if he or she were the owner and not merely one acting with the permission of the owner; and (3) the use was reasonably visible to the record owner." *McGill v. Wahl,* 839 P.2d 393, 397 (Alaska 1992) (citing *Swift v. Kniffen,* 706 P.2d 296, 302 (Alaska 1985)). "[A] claimant must show essentially the same elements as for adverse possession." *Swift,* 706 P.2d at 302.[21] He must overcome the presumption that "[w]hen [he] enters into possession or use of another's property, there is a presumption that he does so with the owner's permission and in subordination to his title." *Hamerly,* 359 P.2d at 129; *see also McGill,* 839 P.2d at 397. "Use alone for the statutory period" is insufficient. *Hamerly,* 359 P.2d at 129. "The use must be open, notorious, adverse, hostile, and continuous." *Dillingham,* 705 P.2d at 416. The purpose of these

the public domain"); *Dillingham,* 705 P.2d at 414 (citing *Hamerly* rule); *see also Alaska Land Title,* 667 P.2d at 723 ("the homestead entry of [a claimant's] predecessor ... fixes the date from which the property rights of the owners of the parcel are to be measured") (rule applied to fixing of private property rights, not consideration of RS 2477 withdrawal from public domain). Since Nissen came on the land in 1907, and Wiest entered in 1910, Nissen had at least three years in which to establish an RS 2477 trail over that segment of the route crossing Wiest's land. *See* Defendant's Exhibit DH, Supp. ER–DH (showing Nissen's entry in 1907, Wiest's in 1910, and Sabin's in 1911).

**18.** For example, Nissen did not establish an RS 2477 over the land entered by homesteader Adelman prior to Nissen's arrival.

**19.** There may be prior homestead entries in the section to which we have no map of homestead rights. Also, the entry dates noted on Exhibit J

and recited by the judge in his findings, DCF 42–44, may not reflect all the entrymen with superior claims.

**20.** Shultz does not suggest that he has a prescriptive easement against the government based on use occurring *after* the Army acquired the Fort Wainwright land. *See 3 Powell on Property* ¶ 413 at 34–136–8 to 34–137 (describing theoretical difficulty); 28 U.S.C. § 2409a(n) (Quiet Title Act not to be construed to permit suits based on adverse possession).

**21.** Public prescriptive easements involve the public "use, not possession of land." Jesse Dukeminier & James E. Krier, *Property* 860 (2d ed. 1988); *see also Dillingham,* 705 P.2d at 415 (discussing distinction between use and possession).

requirements is "to put the record owner on notice of the existence of an adverse claimant." *Swift*, 706 P.2d at 302. In some cases, a private permissive easement may become prescriptive if it "was for many years the only means of passage [through] the dominant estate." *McGill*, 839 P.2d at 398. The fact that the easement is shared does not defeat the claim because "[i]t would not be expected that an easement holder would object to traffic on or use of that part of a roadway which did not interfere with its [sic] [the easement holder's] use." *Id.*

▮▮▮ At the time Nissen and other homesteaders fanned out along the Chena River east of Fairbanks, the trail roughly following the river [22] appears to have been one of the few routes passable year-round. The affidavits in support of Nissen's homesteading claim make it clear that these residents often travelled between homesteads. The Army seizes on the neighborly nature of the visits to dispute Shultz's proof of prescriptive use. It suggests that Shultz has not overcome the presumption that the routes were used by permission. The Army misunderstands the adversity criterion. To assert a public easement by prescription, the public need only act "as if [it] were claiming a permanent right to the easement." *Swift*, 706 P.2d 296. Since overland travel to Fairbanks from the homesteads east of the base clearly required some kind of right of way, all interested parties were on notice that an easement was being established. *See id.; McGill*, 839 P.2d at 398. Moreover, the public nature of the route, and its shared use, reinforce Shultz's claim that at the very least an easement by prescription took hold. The route was there. The homesteaders used it. No one challenged their right.

### III.

### *Statute of Limitations*

In addition to finding that no right of way existed, the district court held Shultz's action barred under 28 U.S.C. § 2409a(g). DCF 20, 60, 75, 78. Even though a public right of way across Fort Wainwright existed in 1937,

the right is subject to defeat by the statute of limitations provision of the Quiet Title Act.

▮▮▮ Quiet title claims against the United States are subject to a 12-year statute of limitations from the date on which the claimant "knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g). A statute of limitations defense in this context is jurisdictional. *Park County v. United States*, 626 F.2d 718, 720 (9th Cir.1980). The limitation must be strictly construed in favor of the government. *Shultz*, 886 F.2d at 1159. Federal law applies. *Hawaii v. United States*, 866 F.2d 313 (9th Cir.1989).

▮▮▮ A quiet title action will "be deemed to have accrued" at the time a claimant received or had actual or constructive notice of the United States' claim on the land. *D.C. Transit System, Inc. v. United States*, 531 F.Supp. 808, 810–11 (D.D.C.1982), *aff'd*, 790 F.2d 964 (D.C.Cir.1986). "The existence of one uncontroverted instance of notice suffices to trigger the limitations period." *Nevada v. United States*, 731 F.2d 633, 635 (9th Cir.1984). Any action sufficient to "excite attention and put the party on guard" provides adequate notice. *D.C. Transit System*, 531 F.Supp. at 812. Nevertheless, "when the United States' claim is vague and ambiguous," the limitations period does not begin to run. *Shultz*, 886 F.2d at 1160. In addition, "[i]f the government . . . apparently abandon[s] any claim it once asserted, and then . . . reasserts a claim, the later assertion is a new claim and the statute of limitations for an action based on that claim accrues when it is asserted." *Id.* at 1161. We apply a reasonableness test. *Id.* at 1160.

▮▮▮ Shultz filed his complaint in 1986. Unless the government apparently abandoned an interest in the right of way he seeks, he is barred from asserting a claim to roads as to which he received notice of the Army's claim of right to restrict access prior to 1974. We limit our consideration of Shultz's right to maintain his action to the easement he seeks across the Homestead, River and Tank Roads, the route currently used by the public to cross the base. The

---

22. *See supra* note 4.

district court found that a section of Wiest Road, which formed part of the historical route taken by homesteaders, had been obstructed by the Fort Wainwright landfill, thus barring Shultz's claim to the roadway. Shultz responds that whatever obstruction to the historical route this landfill represents, it does not in fact obstruct the modern right of way across the base. One continuous route exists. Apart from the restrictions imposed by the permitting system initiated in 1981, the route has always provided unobstructed through passage across the base to the public.

We agree with Shultz's analysis. When a modern route is open, the fact that an Army facility is placed over an historical route, one no longer forming part of the network of roads that link Fairbanks with the communities east of the base, is insufficient to "excite attention" or put civilians "on guard" that their right to cross the military installation has been challenged. It would not be reasonable to require civilians to monitor the Army's obstruction of historical routes in order to preserve the right to use the modern throughway. *Shultz*, 886 F.2d at 1160. Only when present day patterns of travel across the base are interfered with is it proper to charge individuals with the knowledge of the government's claim over that route. Prior to 1981, it appears no "uncontroverted instance[ ] of notice," *Nevada*, 731 F.2d at 635, served to alert civilians that their right of passage, preserved by the proviso to the Army's acquisition of the land, was in jeopardy.

In other circumstances, we have found the "mere[ ] assert[ion] [of] some federal authority over a backroad" enough to bar a quiet title action because it constituted sufficient public notice. *Nevada*, 731 F.2d at 635 (discussing *Park County*, 626 F.2d at 720–21 ("single sign" adequate notice)). We cannot apply the same reasoning here. Those crossing the base subject themselves to federal authority simply by entering the installation. That the Army occupies Fort Wainwright and maintains its roads is not enough "warning" that it has displaced the rights expressly reserved for the public in its title. We conclude that Shultz is not barred from bringing his quiet title action.

## VI.

We agree with the district court that this case turns on a simple inquiry: "to see that [a] road was in existence before the dedication for Fort Wainwright, and that it wasn't blocked until the 1981 period." Tr. I at 89.[23] A homesteaders' access trail—their right of way—was in existence within the meaning of Alaska law before the army took possession of the base. The early homesteaders' route became the road now known as Homestead Road. This is the same route Shultz and his neighbors travelled without obstruction before the Army instituted the system of permits.[24] Left with the definite impression that a mistake has been made, we reverse. We hold that Shultz established that a right of way existed prior to the Army's withdrawal of the land and that it has not been obstructed at a time or in any manner that triggered the applicable statute of limitations provision.

The Army took possession of its Fort Wainwright landholding burdened by the rights of local homesteaders to use of a right-of-way that connected the lots to the east of the base with Fairbanks. It cannot now claim that the users of the modern day roadways cross "merely with [its] permission." *Cf. McGill*, 839 P.2d at 398.[25]

---

23. Shultz filed his complaint in 1986. The statute of limitations is triggered by notice given prior to 1974. 28 U.S.C. § 2409a(g) (12 years).

24. To require a permit, for example, for identification or proof of competence to operate a vehicle is not necessarily to obstruct passage. It may constitute regulation perfectly consistent with the public's essential right of passage. *See infra* note 25.

25. Shultz has not argued, nor do we suggest, that the Army may not regulate the *"manner* of [his] use"* of a roadway. *United States v. Vogler*, 859 F.2d 638, 642 (9th Cir.1988). Rather he insists that the critical question posed by this case is whether the Army may restrict his *access* to a roadway, whether it may, as a matter of discretion or of right, exclude him altogether from its network of roads traversing the base. Having found that Shultz is entitled to cross Fort Wainwright, we note, however, that the Army may reasonably regulate his passage. *See Adams v. United States*, 3 F.3d 1254, 1258 n. 1 (9th Cir.

REVERSED.

The appeal relating to costs, No. 92–35580, is dismissed as moot.

DISMISSED.

1993) (easement under RS 2477 no bar to rea- sonable Forest Service regulations).