Joanne **FITZGERALD**, Appellant,

v.

Craig **PUDDICOMBE** and John Dunham, Appellees.

No. S–6579.

Supreme Court of Alaska.

April 26, 1996.

Rehearing Denied May 6, 1996.

JoAnne Fitzgerald, Wasilla, pro se.

Patricia R. Hefferan, Kopperud and Hefferan, Wasilla, for Appellees.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS and EASTAUGH, Justices.

### OPINION

COMPTON, Chief Justice.

## I. INTRODUCTION

Craig Puddicombe and John Dunham filed an action to quiet title to property they owned. Joanne Fitzgerald and Michael Connor claimed a right to use a trail through the property. After a bench trial, the superior court denied Fitzgerald's and Connor's claims, quieted title in and awarded partial attorney's fees to Puddicombe and Dunham. Fitzgerald appeals. We reverse.

---

## II. FACTS AND PROCEEDINGS

Puddicombe and Dunham own United States Survey 5265 (USS 5265), located on the Knik River near Metal Creek. They acquired the property in 1983 from Joanne Roberts. Roberts had acquired the property from Doug Sumner, who homesteaded the property.

Sumner entered the property in 1965. He testified that when he first visited the area, there were a number of narrow trails going from Metal Creek onto his homestead. Using a bulldozer, Sumner built a driveway on the property. He testified that the driveway did not precisely follow, but may have roughly paralleled, one or more of the existing trails. He placed a cable across the entrance to the driveway and posted no trespassing signs on the property.

Sumner obtained a patent to the property in 1979. The patent reserved no easements or rights-of-way for the general public or for private individuals.

In 1978 Connor and Fitzgerald staked mining claims in the Metal Creek area. Since then, Connor and Fitzgerald consistently have gained access to their claims through USS 5265.

In 1990, to more carefully limit access to USS 5265, Dunham and Puddicombe installed a more permanent, locking cable across the driveway. Puddicombe offered Connor a key to the cable and an easement across the property. Connor refused the offer and asserted that he did not need permission to pass through the property. Puddicombe and Dunham filed suit to quiet title to the property, naming, *inter alia*, Connor and Fitzgerald as defendants.[1]

Defendants claimed a right to pass through USS 5265 on the basis of both private and public prescriptive easements, and on the basis of a public right-of-way pursuant to former 43 U.S.C. section 932, Revised Statute (RS) 2477. The superior court rejected all their claims, quieted title in Puddicombe and Dunham, and ordered Connor and Fitzgerald to pay thirty percent of Puddi-

---

1. The other defendants settled before trial.

combe's and Dunham's attorney's fees. Fitzgerald filed a motion for a new trial under Alaska Civil Rule 59, on the ground of newly discovered evidence. The superior court denied the motion without comment.

Fitzgerald claims the superior court erred (1) in its determination that no RS 2477 public right-of-way through USS 5265 exists, (2) in denying her motion for a new trial, and (3) in assessing attorney's fees against her.

## III. DISCUSSION

■ The superior court's determination that no RS 2477 right-of-way through USS 5265 exists was based on factual findings about the use of the property and legal conclusions about whether that use was sufficient to establish an RS 2477 right-of-way. We review factual findings under the clearly erroneous standard. *See Oaksmith v. Brusich,* 774 P.2d 191, 195 (Alaska 1989); *Fairbanks North Star Borough v. Tundra Tours,* 719 P.2d 1020, 1024–25 (Alaska 1986). We review *de novo* the application of law to the relevant facts. *See Luedtke v. Nabors Alaska Drilling, Inc.,* 834 P.2d 1220, 1223 (Alaska 1992).

■ RS 2477 was a congressional grant of rights-of-way which provided: "[T]he right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." 43 U.S.C. § 932, *repealed by* Pub.L. No. 94–579, Title VII, § 706(a), 90 Stat. 2793 (1976), *quoted in Hamerly v. Denton,* 359 P.2d 121, 123 (Alaska 1961). The grant was self-executing; an RS 2477 right-of-way would have come into existence automatically if a public highway was established across public land in accordance with the law of Alaska. *Shultz v. Dep't of Army,* 10 F.3d 649, 655 (9th Cir.1993). Although RS 2477 was repealed in 1976, it nevertheless governs

this case since the claimed right-of-way would have existed at the date of repeal. *See Dillingham Commercial Co. v. City of Dillingham,* 705 P.2d 410, 413 (Alaska 1985).

■ In order to have completed the grant there must have been " 'either some positive act on the part of the appropriate public authorities of the state, clearly manifesting an intention to accept a grant, or . . . a public user for such a period of time and under such conditions' " as to indicate that the grant had been accepted. *Id.* at 413–14 (quoting *Hamerly,* 359 P.2d at 123).

■ RS 2477 granted rights-of-way over "public lands" only. Once the land had passed into private hands, the grant could no longer be accepted. *Hamerly,* 359 P.2d at 123. Homesteads pass from the public domain to the private as of the date of entry. *See Id.* ("When a citizen has made a valid entry under the homestead laws, the portion covered by the entry is then segregated from the public domain. . . . Consequently, a highway cannot be established under the statute during the time that the land is the subject of a valid and existing homestead claim."); *see also Dillingham,* 705 P.2d at 414. Sumner entered the property in 1965. Therefore, to prove the existence of an RS 2477 right-of-way, Fitzgerald must prove acceptance of the grant before 1965.

Fitzgerald argues that public dedication acceptance of the RS 2477 grant is demonstrated by the use of government money to improve the trail. The superior court found that "Sumner has not been shown to have used government money to build his trail." This finding is fully supported by the record.

Fitzgerald also argues that public acceptance of the grant is manifested by the fact that the trail was "surveyed, platted and described in field survey notes." [2] The supe-

---

2. Fitzgerald's argument is based on testimony given by Loretta Fitzsimons, a land law examiner for the B.L.M.:

> The Court: Does that mean to you that this file doesn't show anything regarding whether or not there is a public trail through the property? Ms. Fitzsimons: *The field examination and the survey indicate that there is.* But we had no authority to put it in the patent under [sic]. In other words a reservation has to be put in the patent pursuant to some law and we did not have a law to put it under there.

*See* Appellant's Reply Brief at 15–16 (emphasis is Appellant's). As Fitzsimons' testimony makes clear, the B.L.M. could include in the survey only those rights-of-way established prior to the survey; it had no authority to dedicate the trail. Moreover, the survey was done in 1974 or 1975, ten years after the date of entry. The presence of trails through the property at the date of survey is not relevant to the RS 2477 determination.

rior court determined that Fitzgerald had not proven that the statutory grant was accepted by the State. We agree with this determination.

We disagree, however, with the superior court's determination that Fitzgerald did not show pre-entry use sufficient to establish public-use acceptance of the RS 2477 grant.

 The extent of public use necessary to establish acceptance of the RS 2477 grant depends upon the character of the land and the nature of the use. *See Shultz,* 10 F.3d at 655 ("Our decision must take into account the fact that conditions in Alaska present unique questions ... What might be considered sporadic use in another context would be consistent or constant use in Alaska."); *Ball v. Stephens,* 68 Cal.App.2d 843, 158 P.2d 207, 211 (1945) ("The travel over the road ... was irregular but that was due to the nature of the country and to the fact that only a limited number of people had occasion to go that way."). Although "infrequent and sporadic" use is not sufficient to establish public acceptance of the grant, *Hamerly,* 359 P.2d at 125, continuous use is not required. *Shultz,* 10 F.3d at 656; *cf. McGill v. Wahl,* 839 P.2d 393, 397 (Alaska 1992) (requiring proof of continuous use to establish prescriptive easement). Nor does the route need to be significantly developed to qualify as a "highway" for RS 2477 purposes; even a rudimentary trail can qualify. *See Dillingham,* 705 P.2d at 414; *Shultz,* 10 F.3d at 656–57.

In *Hamerly,* the court rejected an RS 2477 claim where the evidence showed that a total of four individuals used the route on a limited number of occasions during the time when the property through which it passed was open to the public. *Hamerly,* 359 P.2d at 124–25. It noted that the nature of the road belied public highway status:

> The road could not be considered as something that was either necessary or convenient for the accommodation of the public. Where there is a dead end road or trail, running into wild, unenclosed and uncultivated country, the desultory use thereof ... does not create a public highway.

*Id.* (footnote omitted).

In *Dillingham,* we held that a road running across private property from the city docks to the town was subject to an RS 2477 right-of-way because roughly the same route had been used in the 1920's and 30's, before the property was withdrawn from the public domain. *Dillingham,* 705 P.2d at 413–14. The observation, from *Hamerly,* that a public highway must be "either necessary or convenient for the accommodation of the public" was expressed as a requirement that the claimed right-of-way must have "definite termini." *Id.* at 414; *see also Shultz,* 10 F.3d at 657 ("Trails 'running into wild, unenclosed and uncultivated country' do not meet the minimum standard of definiteness (they lack one terminus) nor do they suggest sufficient public use." (citing *Dillingham,* 705 P.2d at 414)). However, we also held that "[i]f there is a public road on [the property], it may be used for any purpose consistent with public travel." *Dillingham,* 705 P.2d at 415.

With regard to the existence of a trail across the property, the superior court found:

> There is a trail, a well established trail ... that proceeds approximately 22 miles along the Knik River to the general area of the Sumner property. However, that trail has not been shown on any evidentiary standard to have gone through the Sumner/Puddicombe property.

 That finding notwithstanding, it is clear that there were trails through the property before 1965. Sumner, the entryman, testified that there were several trails across USS 5265 when he originally homesteaded the property, at least one of which was several decades old. Al Frey testified that a well-defined trail existed in 1954. James Hermon testified that there was "really a good trail" through the property in the 1940's. Although a single trail may not have predominated prior to entry, a fair reading of Sumner's testimony reveals that he generally followed the trails' established route in constructing his driveway:

> Ms. Hefferan: Now, did you put this driveway on existing road or trail or was there anything there when you built your driveway?

> Mr. Sumner: There could have been a trail there that I might have crossed two or

three times, all of the trails didn't go straight up the hill. They just wandered around the easiest way. I basically just put the road, driveway up straight as I could.

Ms. Hefferan: So you didn't follow any existing trail when you built your driveway?

Mr. Sumner: I didn't set out to follow any trail, I might have went right over one and off of one to the side but I went the easiest way, same as the trails.

. . . .

The Court: Is that the trail as you blazed it or did it exist before you?

Mr. Sumner: Yes, I put it in. It is fairly close since I put it in.

The Court: What existed at the mine [sic] before you blazed it?

Mr. Sumner: There was a partial trail that I basically followed, not exactly, but I put in the trail a lot closer and a lot straighter.

With regard to the use of the trail, the superior court found:

[I]t may legitimately be concluded that some miners, hunters, and other wilderness travelers crossed the parcel on various occasions over a period of fifty to sixty years. However, the evidence regarding pre–1960 use of this parcel of land and the surrounding area is vague. It has not been shown that any particular trail was used during the pre–1960 years, either on or off US 5265 in such a way as to show the RS 2477 grant was accepted by the public. Jim Hermon prospected in the area and trapped there from 1942 to the early 1960's. The trail he used for trapping was not the trail Sumner cut out in the 1960's. He used a "good" walking trail from Metal Creek which Sumner later built a cabin across. Hermon testified that he knew of approximately six other persons who used the same trail in the 1930's, 1940's and 1950's, "at one time or another". Hermon himself didn't use the trail after 1960. The trail Hermon used "went along the bank". It was not for the most part located along the trail cut by Sumner across his parcel. Before the 1930's the evidence does not show a specific location

for any trail across the parcel. Hermon's testimony is the only credible basis for a finding of specific use of a trail that actually crossed the parcel. That trail was used by less than ten persons in vaguely-described circumstances over a period of three decades prior to Sumner's entry on the land. . . . The use described by Hermon is not only vague, it can be accurately described as "infrequent and sporadic" . . . Thus, although I find that some persons used a trail (or trails) across the Sumner property prior to his entry, their use did not constitute public acceptance of the grant.

These findings are not an accurate summary of the testimony. Hermon testified that he and all his "brothers, neighbors, and relatives" regularly used the trail for hunting in the spring and fall between 1942 and 1960. He regularly used the trail in the winter for trapping during those years, and occasionally saw others on the trail when running his trap lines. Hermon testified that prospectors, at least six of whom he could name, used the trail to access their claims. Al Frey also testified that prospectors had used the trail. The "at one time or another" quote in the superior court's findings is used out of context. In response to a question about how many people were mining on Metal Creek, Hermon testified, "I suppose that all those people around Matanuska there at one time or another were up there trying to find some gold in there."

The court's finding that "[t]he trail Hermon used 'went along the bank'" also is misleading to the extent that it suggests that the trail he used was not on USS 5265. On rebuttal, Hermon did testify that the trail he used didn't start in the same place as Sumner's driveway. However, he also testified that the trail he remembered began on the parcel, continued on the property to where Sumner built his cabin, and may have connected with the driveway at some point along the trail.

In any event, it is not necessary, as the trial court appears to suggest in its findings, that the precise path of the trail be proven. It is enough for one claiming an RS 2477 right-of-way to show that there was a gener-

ally-followed route across the land in question. *See Shultz*, 10 F.3d at 655. That much Fitzgerald has shown.

The conclusion that the property was used regularly before 1965 to gain access to the lands beyond it gains even greater vitality in light of the testimony from Hermon and Frey, as well as the defendants, that the route through the property was the only practical way to reach these lands.[3]

In our view, Fitzgerald has shown public use "for such a period of time and under such conditions as to prove that the grant has been accepted." The facts here are considerably more compelling than those presented in *Hamerly*. This is not a case of "infrequent and sporadic" or "desultory"[4] use of a "dead end road or trail". *Hamerly*, 359 P.2d at 125. Rather, the evidence demonstrates the public regularly used the trail to travel from the river bed to Metal Creek and to the lands and mining claims (definite termini) beyond USS 5265. In the parlance of precedent, the trail was "necessary or convenient for the accommodation of the public." *Id.*

## IV. *CONCLUSION*

Fitzgerald has demonstrated that the public accepted the statutory grant of right-of-way prior to entry. Therefore, we hold that there is a public right-of-way through USS 5265. Accordingly, we REVERSE the superior court on this issue, VACATE the court's award of attorney's fees, and REMAND the case to the superior court for a determination of the precise location and extent of the right-of-way.[5]

---

3. Connor and Dennis Illies on one occasion when they were prevented by force of arms from passing through USS 5265, did travel up to their claims using a different route. Although the plaintiffs referred to this route as an alternative access, Connor's and Illies' testimony was that they used the route only once, that it was dangerous, and that they could not use it to travel back down to the bottom of the trail.

4. "Desultory: 1. Marked by lack of order or planning: disconnected 2. Occurring haphazardly: random." *Webster's II New Riverside University Dictionary* (1984).

5. Because of our holding, we do not address Fitzgerald's claim for a new trial.