*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KELLY A. DICKSON, TRUSTEE OF THE KELLY A. DICKSON 2008 TRUST, and DONNA C. DEFUSCO, | ) ) ) ) | Supreme Court No. S-16468 |
| | ) | Superior Court No. 3AN-12-07260 CI |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | No. 7307 – October 5, 2018 |
| STATE OF ALASKA, DEPARTMENT OF NATURAL RESOURCES, and all other persons or parties unknown claiming a right, title, estate, lien, or interest in the real estate described in this action, | ) ) ) ) ) ) ) ) | |
| Appellees. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Adolf V. Zeman and Leslie R. Need, Landye Bennett Blumstein LLP, Anchorage, for Appellants. Z. Kent Sullivan, Assistant Attorney General, Juneau; Cheryl Brooking, Assistant Attorney General, Anchorage; and Jahna Lindemuth, Attorney General, Juneau, for Appellee State of Alaska.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

The owners of real property near Big Lake appeal a superior court decision, following trial, in favor of the State, Department of Natural Resources (DNR), that recognized an RS 2477 right of way over their property for the Historic Iditarod Trail and a prescriptive easement for public use of a road. The property owners argue that the evidence did not support the court's findings of the right of way and the easement; that the court made a number of procedural and evidentiary errors that collectively deprived them of procedural due process; and that the large attorney's fees award in favor of the State was excessive in light of its likely deterrent effect and the State's decision to vigorously litigate this case for its precedential effect.

We conclude that the court did not clearly err in its findings of fact, and we affirm its decision recognizing the RS 2477 right of way for the Historic Iditarod Trail and the prescriptive easement for the road. We see no abuse of discretion in the court's procedural and evidentiary rulings. However, we conclude that there may be a compelling reason to vary the presumptive attorney's fees award under Alaska Civil Rule 82(b)(3). We remand for the superior court's further consideration of this issue.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Kelly Dickson and Donna DeFusco own adjacent parcels of land near Big Lake. The property's original 160 acres were homesteaded in 1958 by their father, Benjamin Cowart, who received a patent from the federal government in 1965. He later purchased two 40-acre tracts that bordered his acreage to the southeast. Dickson and DeFusco inherited the property upon their mother's death in 2007. Dickson now owns the eastern 80 acres of the original homestead plus the two added 40-acre tracts; DeFusco

owns the western 80 acres.[1] The property is situated between the community of Knik to the east and the community of Susitna to the northwest.

At issue in this case are two easements the superior court found to exist across Dickson and DeFusco's property. The first involves the Historic Iditarod Trail,[2] a trail running from Seward to Nome that was first surveyed in the early 1900s. The second easement is for part of Homestead Road[3] and was created in 1958 when a neighbor, Charles Sassara, Sr., used a D8 Caterpillar to improve access to his and other homesteads in the area.

### 1. The Historic Iditarod Trail

The Historic Iditarod Trail was first formally surveyed in 1908 as part of the route from Seward to Nome; a section of the trail lay between Knik and Susitna Station. The Alaska Road Commission rerouted the trail in 1912 to create a more direct route between those two points, and it designated the newly realigned portion as Route 20A. The Historic Iditarod Trail was used as a mail route in the 1910s and had dogsled and foot traffic. By 1921 the new railroad had taken over mail delivery; according to Bryan Taylor, a DNR employee qualified as an expert in "the trail history at issue in this case," the Road Commission "abandoned" the Historic Iditarod Trail around this time in the sense that it was "not going to be maintaining it any longer." But

---

[1] The arguments of both sides in this case apply to the adjoining properties of Dickson and DeFusco as a single unit; no issues require us to consider either property individually. Unless otherwise required by context, we refer to the two adjoining properties singly as "Dickson and DeFusco's property."

[2] The Historic Iditarod Trail was referred to by other names during trial including the Knik to Susitna Trail, RST 118, and Alaska Road Commission (ARC) Route 20A.

[3] Homestead Road was also referred to at trial as Sassara's Road, Khyber Road, Khyber Pass Road, Kerber Road, and the Main Road.

people in the area continued to use the trail for trapping and transporting freight to their homesteads.

In 1978 Congress dedicated portions of the Seward-to-Nome trail as the Iditarod National Historic Trail (the National Trail).[4]  The route is distinct from the Historic Iditarod Trail, though some sections are the same.  In 1979, as part of a National Trail survey, the State surveyed the Historic Iditarod Trail from Knik to Goose Creek; in 1983 it surveyed the trail from Goose Creek to Susitna Station.  The State then asked the Matanuska-Susitna Borough to vacate some of the easements for the Historic Iditarod Trail identified in the 1983 survey and realign those parts of the trail to the section lines in order to make the trail continuous.  The Mat-Su Borough followed the State's recommendations and vacated portions of the Historic Iditarod Trail on borough lands.

In 1983 the State sent Cowart a letter advising him that the Historic Iditarod Trail crossed his property.  The State's information was based on the 1983 National Trail survey, interviews of people who used the Historic Iditarod Trail, and aerial maps, among other things.  Shortly thereafter, Cowart asserted a right to block the trail.  The Iditarod Trail Race was scheduled to cross his property the following year; Cowart sent a letter to the Knik Chapter of the Iditarod Trail Blazers in December 1983, stating that his property was "posted and trespassing will not be permitted."  He placed a metal post where the Historic Iditarod Trail entered his property, bearing a sign that read, "POSTED," "PRIVATE PROPERTY," and "NO TRESPASSING."  The sign was still there decades later when this case went to trial.

A significant issue at trial was whether the Historic Iditarod Trail crossed the property before Cowart homesteaded it in 1958 and thus took the land out of the

_____

[4]     National Parks and Recreation Act of 1978, Pub. L. No. 95-625, § 551, 92 Stat. 3467, 3512-13 (codified at 16 U.S.C. § 1244(a)(7) (2012)).

public domain. To prove that the trail preexisted Cowart's homesteading activities, the State called several expert witnesses. Rockford Beard-Weber, a DNR employee, testified that he had assembled a Geographic Information System (GIS) data file of surveys, aerial photos, and other material that could be layered onto maps of the area encompassing Dickson and DeFusco's property. The available resources included lidar, which Beard-Weber described as "a digital elevation model" created through aerial imagery.[5] He testified that lidar uses "a signal that hits the ground and reflects back to the plane" and has the advantage of being able to "penetrate[] a good deal of foliage," allowing a view "below the canopy, to some extent." He testified that he could see the Historic Iditarod Trail to the east of Dickson and DeFusco's property in the 1960 and 1962 aerial photos but the trees on their land made it much harder to find. The lidar, however, allowed him to penetrate the canopy and make out the trail as a line crossing the property.

Beard-Weber also visited the property and walked across it holding a GPS device that showed where DNR believed the Historic Iditarod Trail to be. He testified that "a lot of times it's easier to find old trails by looking up instead of looking down" because of the absence of tall trees in a line where tall trees are expected. He reported finding "a fairly straight line with no large trees right along the middle of the lineal feature or immediately adjacent to it." He testified that the Historic Iditarod Trail was one of the easier trails to locate using this method.

The State also called a professional photogrammetrist — someone who, as the trial court explained, "uses a blend of aerial photos to create a three-dimensional map." The witness, Bryan O'Malley, testified about the conclusions he drew from aerial

---

[5] "Lidar" is defined as "[a]n optical sensing technology used to determine the position, velocity, or other characteristics of distant objects by analysis of pulsed laser light reflected from their surfaces." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016).

photos taken in 1950, 1951, 1960, and 1962. According to O'Malley, the photos showed a trail "entering [Dickson and DeFusco's property] from the east . . . and exiting to the west . . . at least by 1950." He testified that he could see the trail's entry point on the east side of the property in images from year to year and that its exit point on the western side was visible in the 1950, 1951, and 1960 images.

To support their defense to these claims Dickson and DeFusco called Jonathon Lang, an expert in land surveying. Having reviewed the same aerial photos as the State's experts, Lang testified that they did not show the Historic Iditarod Trail on Dickson and DeFusco's land in 1950 or 1951. He testified that a 1911 Bureau of Land Management (BLM) survey showed the Historic Iditarod Trail three or four miles away from the property, and that the trail was also shown outside the property on a 1964 BLM survey and a 1923 Road Commission map of the Cook Inlet District. Lang also looked at 1950s-era quadrangle maps produced by the United States Geological Survey (USGS). He testified that the 1952 map showed a trail going through Dickson and DeFusco's property but it was identified as "tractor trail"; the same map showed the Historic Iditarod Trail ending well north of Dickson and DeFusco's property. Lang also testified that he could not see the trail when he walked the land.

In its rebuttal case the State called another expert, Karen Tilton, who like Lang was a professional land surveyor. Tilton agreed with the State's other witnesses that the Historic Iditarod Trail had most likely crossed Dickson and DeFusco's property since at least 1950. She testified that the 1911 BLM survey on which Lang relied showed the trail north of Dickson and DeFusco's property because the survey predated the trail's realignment in 1912. She testified that the 1964 BLM survey on which Lang relied may have missed the Historic Iditarod Trail because of clearing that was going on at the same time. She testified that Alaska Road Commission maps gave general rather than precise trail locations, and that Road Commission and USGS maps locating the trail

north of Dickson and DeFusco's property were likely based on the 1911 BLM survey that predated the trail's realignment.

### 2. Homestead Road

Dickson and DeFusco do not dispute that Homestead Road crosses the southern portion of the original homestead's 160 acres. Charles Sassara, Sr. testified that he built Homestead Road (which he sometimes referred to as "Burma Road") with a D8 Cat, probably in 1958, to improve access to area homesteads including his own. He testified that no one gave him permission to build the road. In the 1970s the State produced a map of highways in the Knik area showing Homestead Road as a highway, meaning that it was open to motorized vehicles.

A number of witnesses testified about their use of Homestead Road. Sassara testified that he used it from the 1950s to the late '60s or early '70s, along with other local property owners who drove highway vehicles across it in all seasons. Sassara testified that he saw mushers and hunters use the road as well and that everyone seemed to believe it was open to the public. Several other witnesses testified about using the road between 1984 and 2008 for dogsled races and training without seeking or receiving permission. One of these witnesses, a local musher, testified that he thought Joe Redington, Sr. might have received permission to use the road for dogsledding, but the witness did not know any details.[6]

### 3. Dickson's communications with DNR

In 2008 Dickson used felled trees to block Homestead Road at both sides of her property, but the barriers were soon pushed aside, and others' use of the road

---

[6] Joe Redington, Sr., known as "the Father of the Iditarod," is among the most well known and respected of Alaska's mushers. *See* BILL SHERWONIT & JEFF SCHULTZ, IDITAROD 23-31 (2002); AS 35.40.140 (designating a portion of road in the Matanuska-Susitna Borough as "the Joe Redington, Sr., Memorial Trail").

continued. Dickson testified that she also put up "No Trespassing" signs and brightly colored tape at the entry points. In August 2008 she sent a letter to her neighbors saying she had blocked Homestead Road and that any use of the road to cross her property "is not authorized, and constitutes a trespass." DNR was notified of the obstruction and sent Dickson a memo, authored by its employee Ben Hagedorn, stating that the blocked trail was "not, in fact," the Historic Iditarod Trail, which "[a]ccording to DNR records . . . lies to the north of Ms. Dickson's lots along the section line." The Hagedorn memo concluded, "It is the State's position that Ms. Dickson has legally blocked an unauthorized, or unprotected, trail across her property."

In 2009 DNR informed Dickson and DeFusco by letter that the Historic Iditarod Trail "appears to cross your parcel" but that DNR "has no plans to create any easements on or leading to private lands without the landowner's consent." (Emphasis omitted.) Instead, DNR stated that it was "interested in working with [Dickson and DeFusco] to formally establish an easement across [the] land," which would be "entirely voluntary." Dickson and DeFusco did not agree to the proposal. At a meeting held by some members of the Iditarod Trail Committee in January 2012, a DNR employee informed them that "[t]he old [Homestead Road] at the south end of . . . Dickson's property and the road at the north end do not have public easements" and that "Dickson has every right to block both of those routes." In 2011 Dickson installed game cameras to monitor the use of Homestead Road; this produced hundreds of photographs of a variety of users, including mushers, skiers, bicyclists, hunters, hikers, and users of snowmachines, ATVs, and highway vehicles.

In May 2012 Dickson and DeFusco filed a complaint to quiet title to the portions of the Historic Iditarod Trail and Homestead Road crossing or purportedly crossing their property. The State answered and counterclaimed, asserting that Dickson and DeFusco's property was subject to public rights of way for both routes.

### B.     Proceedings

The superior court held a 27-day bench trial. Combined, the parties called 20 witnesses, including five experts. The superior court issued highly detailed, written findings of fact and conclusions of law in June 2016. It found that the Historic Iditarod Trail crossed Dickson and DeFusco's property on a 100-foot right of way established by federal law and recognized thereafter by official acceptance and public use. The court rejected Dickson and DeFusco's claims that the route had been abandoned by the territorial government or vacated by the Mat-Su Borough.

As for Homestead Road, the court found that although it did not occupy a federally created right of way, it did enjoy a prescriptive easement across Dickson and DeFusco's property, and that the easement should be 20 feet wide "in the interest of public safety." The court rejected Dickson and DeFuscos's arguments that laches and estoppel barred the State's claims. Finally, the superior court awarded the State $225,107.03 in attorney's fees and costs.

Dickson and DeFusco appeal.

## III.   STANDARDS OF REVIEW

We review the trial court's factual findings under the clearly erroneous standard.[7] "Factual findings are clearly erroneous if a review of the entire record leaves us with a definite and firm conviction that a mistake has been made."[8] "We will grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony."[9] "We review the superior

---

[7]     *Kazan v. Dough Boys, Inc.*, 201 P.3d 508, 513 (Alaska 2009).

[8]     *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009).

[9]     *Id.*; *see also* Alaska R. Civ. P. 52(a) ("Findings of fact shall not be set aside
(continued...)

court's evidentiary rulings for abuse of discretion."[10] We review "an award of attorney's fees for an abuse of discretion."[11] We "will not find an abuse of discretion absent a showing that the award was arbitrary, capricious, manifestly unreasonable, or stemmed from improper motive."[12]

When reviewing the superior court's decision on a laches defense, we review its findings of fact for clear error and its determination whether to apply laches to those facts for abuse of discretion.[13] Whether equitable estoppel applies is a question of law we review de novo.[14]

## IV. DISCUSSION

Dickson and DeFusco raise a number of arguments on appeal. They challenge the superior court's findings that there is a federally created right of way across their property for the Historic Iditarod Trail and that there is a prescriptive easement across their property for Homestead Road. They challenge the superior court's rejection of their laches and estoppel defenses. They assert that the superior court made numerous

---

[9] (...continued) unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").

[10] *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016) (quoting *Noffke v. Perez*, 178 P.3d 1141, 1144 (Alaska 2008)).

[11] *Bush v. Elkins*, 342 P.3d 1245, 1251 (Alaska 2015) (quoting *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 137 (Alaska 2014)).

[12] *Id.* (quoting *ConocoPhillips Alaska, Inc.*, 322 P.3d at 137).

[13] *Kollander v. Kollander*, 322 P.3d 897, 902-03 (Alaska 2014).

[14] *Ogar v. City of Haines*, 51 P.3d 333, 335 (Alaska 2002).

evidentiary errors during the trial, and, finally, they challenge the court's award of attorney's fees to the State.

A.    **The Superior Court Did Not Clearly Err When It Found That The Historic Iditarod Trail Followed An RS 2477 Right Of Way Across Dickson And DeFusco's Property.**

Section 8 of the Lode Mining Act of 1866 granted "the right of way for construction of highways over public lands, not reserved for public uses"; these are known as RS 2477 rights of way.[15] An RS 2477 right of way is "self-executing, meaning that an RS 2477 right-of-way automatically came into existence 'if a public highway was established across public land in accordance with the law of Alaska.' "[16] A valid RS 2477 right of way requires public acceptance of the grant through either public use or the manifestation of official intent: "[T]he public must use the land 'for such a period of time and under such conditions as to prove that the grant has been accepted,' or appropriate public authorities of the state must act in a way that clearly manifests their intention to accept the grant."[17] Section 8 of the Lode Mining Act was repealed in 1976

---

[15]    Lode Mining Act of July 26, 1866, Ch. 262, § 8, 14 Stat. 251, 253, (codified as 43 U.S.C. § 932 (1925), Revised Statute 2477) (thus abbreviated as "RS 2477"), *repealed by* Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2787 (1976).

[16]    *Price v. Eastham* (*Price I*), 75 P.3d 1051, 1055 (Alaska 2003) (quoting *Fitzgerald v. Puddicombe*, 918 P.2d 1017, 1019 (Alaska 1996)).

[17]    *Id.* (quoting *Dillingham Commercial Co. v. City of Dillingham*, 705 P.2d 410, 413-14 (Alaska 1985)).

when Congress enacted the Federal Land Policy Management Act (FLPMA),[18] but the Act left existing rights of way intact.[19]

Because RS 2477 rights of way applied only to "public lands, not reserved for public uses,"[20] such a right of way could be established only over federally owned "lands open to settlement or other disposition under federal land laws."[21]  A critical factual question in this case, therefore, was whether the Historic Iditarod Trail was established over Dickson and DeFusco's property before the land was taken out of the public domain in 1958 by their father's homesteading activities.[22]  We agree with the superior court's conclusion that, as in the case of prescriptive easements, the party asserting the right of way — here the State — has the burden of proving its case by clear and convincing evidence.[23]

Dickson and DeFusco argue that the superior court clearly erred in finding that the Historic Iditarod Trail crossed their property, contending that the evidence at trial showed only "a muddled history of misinformation and confusion of the [trail's] actual location" rather than "a clear and convincing body of evidence."  But our review of the

---

[18]     Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793 (1976).

[19]     *Price I*, 75 P.3d at 1055.

[20]     *Id.* (quoting *Fitzgerald*, 918 P.2d at 1019.

[21]     *Id.* at 1056 (citing *Hamerly v. Denton*, 359 P.2d 121, 123 (Alaska 1961)).

[22]     *Id.*; *see also Hamerly*, 359 P.2d at 123.

[23]     *Interior Trails Pres. Coal. v. Swope*, 115 P.3d 527, 530 (Alaska 2005); *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 768 (10th Cir. 2005) (explaining that federal law "borrows" state law principles such as burdens of proof in RS 2477 cases).

trial court's fact-finding is deferential,[24] and the trial court's findings in support of an RS 2477 right of way have substantial support in the record. This includes the aerial photos that, according to the State's experts O'Malley and Beard-Weber, showed where the trail entered and exited the property. Beard-Weber testified that both the lidar technology and his on-the-ground observations confirmed the trail's route on the property itself.

Although Lang testified that he could not see the route the State claimed for the Historic Iditarod Trail either in aerial photos or during his site visit, the superior court weighed the experts' testimony and found the State's more credible. And the court could reasonably discount Lang's reliance on historical maps in light of Tilton's testimony about the sources' varied reliability.

In their brief, Dickson and DeFusco cite a number of these maps to support their argument that the Historic Iditarod Trail does not cross their property. The superior court found that historical maps were "not particularly helpful in determining the exact location of [the trail] for a number of reasons," including the maps' "zoomed out" scale, "the lack of survey information, and the limited purposes for which the maps were produced, i.e., . . . without the intent to provide navigable accuracy in any level of detail." We see no clear error in this analysis of the evidence's weight.

We also see no clear error in the superior court's findings that the public authorities manifested their intent to accept the Historic Iditarod Trail as an RS 2477 right of way when the Alaska Road Commission designated it as Route 20A in 1912, and

---

[24]     *See Laybourn v. City of Wasilla*, 362 P.3d 447, 452 (Alaska 2015) ("We . . . 'give particular deference to the superior court's factual findings when . . . they are based primarily on oral testimony, because the superior court, not this court, judges the credibility of witnesses and weighs conflicting evidence.'" (second alteration in original) (quoting *3-D & Co. v. Tew's Excavating, Inc.*, 258 P.3d 819, 824 (Alaska 2011))).

that the trail as it crosses Dickson and DeFusco's property follows the same route. The superior court also described the Alaska Legislature's 1998 enactment of AS 19.30.400, which identified and explicitly claimed existing RS 2477 rights of way throughout Alaska; this statutory ratification expressly included RST 118, the "Knik-Susitna" right of way, which DNR's contemporaneous survey information showed crossing Dickson and DeFusco's property.[25]

Dickson and DeFusco argue that the superior court clearly erred when it rejected their argument that any part of the Historic Iditarod Trail that crossed their property was vacated in 1986 when the Mat-Su Borough, "at the State's direction," vacated parts of the trail between Knik and Susitna Station. The superior court found that the 1983 National Trail survey, and the resulting decision to vacate some "unconnected segments" of the trail, applied only to those sections of the Historic Iditarod Trail that were on public lands. Dickson and DeFusco's cursory argument on this issue does not convince us that the superior court was mistaken.

Dickson and DeFusco also argue that the Historic Iditarod Trail was abandoned in 1918; they point to a 1923 Alaska Road Commission map that labels the trail as "Abandoned Trail" and a 1951 Road Commission map that does not show the trail at all. But the superior court heard expert testimony that the term "abandoned" was sometimes used loosely and meant only that the Road Commission would no longer spend money on the trail to maintain it; it did not mean that the Commission intended to relinquish legal title to the route. The court heard testimony that the Commission "abandoned" other routes, such as Route 20B, only to come back and spend money on

---

[25]     Because we affirm the superior court's finding that the territorial government clearly manifested its intent to accept the grant of an RS 2477 right of way, we do not need to address the court's finding that the grant was also accepted by public use.

them when they were needed again.  There was thus evidence to support the superior court's conclusion that the Road Commission's "decision to not spend any additional money on maintaining Route 20A did nothing to negate its clear intent to accept the grant of an R.S. 2477 easement."

Dickson and DeFusco make two other arguments about the RS 2477 right of way that we address briefly.  First, they argue that the superior court erred by setting the width of the right of way at 100 feet.  They contend that the width should have been determined by the same standard that applies to prescriptive easements, based on "what is reasonably necessary and what was originally intended."  But we agree with the superior court that the 100-foot width was dictated both by federal land orders[26] and by AS 19.10.015.[27]

Finally, Dickson and DeFusco argue that the superior court erred by not limiting the RS 2477 right of way to winter use, and specifically to mushing, "the only use that could have occurred prior to 1958."  While prescriptive easements may be limited to the uses that created them,[28] RS 2477 vests rights of travel in the public at large.  "If there is a public road on [a private owner's land], it may be used for any

---

[26]     Public Land Order 601, 14 Fed. Reg. 5048, 5048-49 (August 10, 1949), and Department Order 2665, 16 Fed. Reg. 10,752 (October 16, 1951), established standard widths for public roads, including 100-foot widths for "local roads," which are broadly defined.

[27]     AS 19.10.015 mandates a 100-foot width for "all officially proposed and existing highways on public land not reserved for public use."  "[H]ighway," as used in AS 19.10.015, is defined in AS 19.59.001(8) to include "trail[s]."

[28]     *See Price I*, 75 P.3d 1051, 1058-59 (Alaska 2003) (remanding superior court's alternative finding of prescriptive easement "for a determination of the scope of this easement," which could include "limiting use to certain seasons, prescribing the width of the easement, and specifying the precise uses that may be made of the easement").

purpose consistent with public travel."[29]  The superior court thus did not err by not imposing use restrictions on the RS 2477 right of way.

Seeing no clear error in the superior court's findings of fact and no error in its application of the law, we affirm its decision with regard to the creation of the RS 2477 right of way for the Historic Iditarod Trail on Dickson and DeFusco's property.

**B.    The Superior Court Did Not Clearly Err By Finding A Public Prescriptive Easement For Homestead Road.**

Dickson and DeFusco argue that the superior court erred by determining that there was a prescriptive easement across their property for Homestead Road.  A prescriptive easement is created by use.[30]  A party claiming a prescriptive easement "must show that (1) the use was continuous and uninterrupted for [a] ten-year period . . . ; (2) the claimant acted as an owner and not merely as a person having the permission of the owner; and (3) the use was reasonably visible to the record owner."[31] For purposes of creating a public prescriptive easement, it is "qualifying use by the public" that matters rather than use by a private party.[32]

Dickson and DeFusco argue that none of these elements were met.  They argue first that Homestead Road was not used continuously for a 10-year period anytime between 1958, when Cowart homesteaded, and 2008, when Dickson blocked the road. They argue that the evidence showed only "sporadic use for [dogsled] races" that was necessarily seasonal, and that other "limited evidence of mushing and other recreation

---

[29]    *Dillingham Commercial Co. v. City of Dillingham*, 705 P.2d 410, 415 (Alaska 1985) (citing *Albee v. Town of Yarro Point*, 445 P.2d 340, 344 (Wash. 1968)).

[30]    *See Interior Trails Pres. Coal. v. Swope*, 115 P.3d 527, 529 (Alaska 2005).

[31]    *Id.* at 530.

[32]    *Price v. Eastham* (*Price III*), 254 P.3d 1121, 1125 (Alaska 2011) (quoting *Interior Trails*, 115 P.3d at 529).

is not specific to Homestead Road as it crosses the Property." But again we conclude that substantial evidence supports the superior court's finding of regular public use, not just for dogsled races, but also for year-round access by motor vehicle to area homesteads. There was testimony that users considered Homestead Road to be a public road, a perception confirmed by a State-produced map from the 1970s identifying it as a public highway. This evidence supported the superior court's finding that the use of Homestead Road was continuous and uninterrupted over a 10-year period.[33]

Dickson and DeFusco also argue that the public's use of Homestead Road was not hostile because Cowart had allowed it for many years. But a number of witnesses, including Sassara, Raymond Redington, Jr., and Terry Langholz, testified that they used Homestead Road without the owner's permission. And Cowart, and later Dickson and DeFusco, showed a longstanding hostility toward public use of the trails across their property. Other than Dickson and DeFusco, the only person to testify that Cowart gave permission to use Homestead Road was Vernon Cherneski, a local musher. He testified that he believed Joe Redington, Sr. got Cowart's permission to use Homestead Road; but Cherneski was not a party to that conversation and could not remember the specifics of what he had learned from Redington. The court was not required to credit his testimony, and the countervailing evidence of unpermitted use is sufficient to support the court's finding that the public's use of the road was hostile.

---

[33] The trial court cited *Shultz v. Dep't of the Army*, 10 F.3d 649, 655 (9th Cir. 1993), for the proposition that "[w]hat might be considered sporadic use in another context would be consistent or constant use in Alaska." The cited opinion was withdrawn and superseded on rehearing by *Shultz v. Dep't of the Army*, 96 F.3d 1222 (9th Cir. 1996), but we agree with the superior court that the withdrawn opinion's explanation of "consistent or constant use in Alaska" accurately reflects the state's "geography, its weather, and its sparse and scattered population." *Shultz*, 10 F.3d at 655.

Dickson and DeFusco also dispute that they could ever have received sufficient notice of hostile use because their land was heavily forested, winter access was difficult, and they used it mostly for weekend and summer recreation; they argue that others' use of the property "was so infrequent and left such little evidence of use that [Dickson and DeFusco] were never put on notice of an adverse interest in the [p]roperty." But there was evidence that Homestead Road (unlike the Historic Iditarod Trail) was easily spotted from the air, and the superior court found that "[a]ny reasonable landowner, even for a relatively remote piece of property, would have objectively been able to notice a nine-foot road that has been visible from the air since at least 1960." We are not persuaded that this finding was clearly erroneous.

Finally, Dickson and DeFusco argue that the superior court erred by failing to restrict the road's use to necessary vehicle access to area homesteads and by setting the easement's width at 20 feet. "[A] prescriptive easement's scope should be determined by the nature of the adverse use that led to its creation in the first place."[34] The superior court found that the uses supporting creation of the easement included not just local vehicle traffic but also recreation such as mushing and hunting. The court's failure to place use restrictions on the easement was consistent with the evidence. And the court specifically found that a 20-foot width was reasonable and necessary "in the interest of public safety" in order to allow for two-way traffic on the road.[35] Dickson and DeFusco present no argument why — assuming an easement exists for essentially

---

[34] *Price v. Eastham* (*Price II*), 128 P.3d 725, 728 (Alaska 2006) (citing RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.1 cmt. a (AM. LAW INST. 2000)).

[35] *See Price III*, 254 P.3d at 1131 ("[T]he superior court must make specific findings as to the reasonableness and necessity of increasing the width of the easement.").

-18-                                                                 7307

unrestricted public traffic — the court erred in finding that this width was necessary for safety.

We see no clear error in the superior court's findings with regard to the creation of a prescriptive easement for Homestead Road and therefore affirm that aspect of its decision.

### C. The Superior Court Did Not Err When It Determined That Estoppel And Laches Did Not Bar The State's Claims.

#### 1. Estoppel

Dickson and DeFusco argue that the State should be estopped from claiming rights of way for the Historic Iditarod Trail and Homestead Road because they "reasonably relied on DNR's conduct and words that it (or the public) did not have any interest in an easement" for either trail. "[P]rivate parties may invoke estoppel against the state under exceptional circumstances as a means to avoid injustice."[36] In *Safeway, Inc. v. State, Department of Transportation & Public Facilities*, we explained that a party claiming estoppel in defense of a claim of title to real property must show the following:

> first, that the party making the admission by his declaration or conduct, was apprised of the true state of his own title; second, that he made the admission with the express intention to deceive, or with such careless and culpable negligence as to amount to constructive fraud; third, that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge[;] and fourth, that he relied directly upon such admission, and will be injured by allowing its truth to be disproved.[37]

---

**36** *State v. Dupier*, 118 P.3d 1039, 1053 n.88 (Alaska 2005).

**37** 34 P.3d 336, 340 (Alaska 2001) (alteration in original) (quoting *Dressel v. Weeks*, 779 P.2d 324, 329 (Alaska 1989)).

We also held that an estoppel claim may not be based on a government employee's statement if the employee is "not apprised of the true state of the State's title."[38]

Dickson and DeFusco identify 14 statements by governmental agencies asserting or implying that no easements existed on their property for either the Historic Iditarod Trail or Homestead Road. Ten of these statements relate to the Mat-Su Borough's decision to vacate certain portions of the Historic Iditarod Trail on borough lands in the 1980s. As explained above, however, the evidence supported the superior court's finding that this process was intended to apply solely to public lands and could not have affected Dickson and DeFusco's property.

The superior court also rejected Dickson and DeFusco's reliance on DNR's 2008 memorandum responding to Dickson's decision to block Homestead Road. The court described the memorandum as addressing only whether Homestead Road was part of the Iditarod Trail system (and concluding it was not). The court observed that the memorandum did not assert a position on either of the two critical issues in the case: whether an RS 2477 right of way existed elsewhere on Dickson and DeFusco's property and whether there was some other justification for the public's use of Homestead Road, e.g., a prescriptive easement.

The superior court did not address every statement Dickson and DeFusco rely on for their estoppel argument. We note, however, that there is no evidence — and Dickson and DeFusco do not argue — that the government speakers on whom they relied were "apprised of the true state of the State's title" at the time they made the statements at issue.[39] We conclude that the record supports the superior court's rejection of the estoppel defense.

---

[38]    *Id.*

[39]    *Id.*

### 2. Laches

Dickson and DeFusco also argue that the doctrine of laches bars the State's claims because the State unreasonably delayed asserting its right to either an RS 2477 right of way for the Historic Iditarod Trail or a prescriptive easement for Homestead Road. "The doctrine of laches 'creates an equitable defense when a party delays asserting a claim for an unconscionable period' " and there is "resulting prejudice."[40] "The trial court has broad discretion to sustain or deny a defense based on laches."[41]

In rejecting a laches defense in this case, the superior court relied on our decision in *Keener v. State*, in which we held that the State is not required to bring suit to establish its property rights "simply because problems *might* arise" but only once the landowner has "challenged the State's interest."[42] The superior court observed that "[t]he State is under no obligation to vigorously defend all attempted blockages of R.S. 2477 rights-of-way" and that "[t]o require otherwise would place an unreasonable burden on the State." The court noted that Dickson and DeFusco did not mount a serious challenge to the State's rights of way until 2012, when they filed their lawsuit, and the State asserted its claims two months later. Under the circumstances, we cannot conclude that the superior court abused its broad discretion in deciding whether the laches defense applied.

---

[40] *Offshore Sys.-Kenai v. State, Dep't of Transp. & Pub. Facilities*, 282 P.3d 348, 354 (Alaska 2012) (quoting *State, Dep't of Commerce & Econ. Dev., Div. of Ins. v. Schnell*, 8 P.3d 351, 358-59 (Alaska 2000)).

[41] *Keener v. State*, 889 P.2d 1063, 1066 (Alaska 1995).

[42] *Id.* at 1067 (emphasis in original).

**D. The Superior Court Did Not Deny Due Process Through Procedural And Evidentiary Errors**.

Dickson and DeFusco argue that the superior court "committed numerous evidentiary and procedural errors at trial that prejudiced [them] by denying them the protections of due process." Their arguments are only cursorily briefed, and none of them persuade us that the superior court abused its discretion.

First, Dickson and DeFusco argue that Beard-Weber, though designated as an expert in GIS, was nonetheless allowed over their objection to testify about "maps, mapping, archaeology, dog mushing, surveying, history, photogrammetry, and LiDAR technology." The State counters that everything Beard-Weber testified about either fell within the purview of his expertise or was admissible as the fact testimony of a lay witness.

Second, Dickson and DeFusco argue that the superior court "improperly admitted DNR's GIS database through Beard-Weber as an exhibit when it should only have been allowed for demonstrative purposes" because the database included only evidence favorable to the State's case and was therefore "akin to an expert report." But Dickson and DeFusco do not contend that they lacked the opportunity to cross-examine Beard-Weber about the database or to present their own contrary evidence.

Third, Dickson and DeFusco argue that the superior court abused its discretion when it refused to enforce what they contend was DNR's agreement not to use photos taken by Dickson's game camera to support its claims of public use. The alleged agreement was contained in a 2012 letter from an assistant attorney general, encouraging Dickson and DeFusco to allow public use of Homestead Road during the pendency of the lawsuit and stating that "nothing occurring after the filing of this lawsuit is relevant to whether or not an easement has or has not been created [o]n Homestead Road." Even assuming this was a promise not to use later-discovered evidence, the State argues that

it used the game photos not to prove the existence of the easement but only to show "the type, nature, and frequency of use."

Fourth, Dickson and DeFusco argue that they were prejudiced when the court "allowed the State to amend its claims, at trial, on the record through the testimony of a DNR employee, without notice" to them. They do not identify the purported amendment except by reference to the transcript page at which it was made. There, a DNR employee corrected several dates and added several more events to a list of mushing and snowmachine races the State had first identified in its answer. The record does not disclose any objection to these apparently minor corrections of the pleading.

Fifth, Dickson and DeFusco argue that the superior court abused its discretion when it "allowed the State to present 17 days of evidence and testimony after representing to the parties that each would have only 10 days to present their case, giving DNR a considerable advantage." Dickson and DeFusco assert that they rested after seven and a half days in reliance on the court's time allocation and were unfairly surprised when the court allowed the State to go substantially over time. The State points out in response that the court repeatedly offered Dickson and DeFusco more time to present their case but they failed to take advantage of the opportunity, and on appeal they do not identify any evidence or witnesses they did not have time to present.

Finally, Dickson and DeFusco contend that the court abused its discretion when the State produced late-discovered evidence in the midst of trial and they were denied a continuance to give them time to respond. They do not identify the evidence, the relevant time line, or how they were prejudiced, but the State describes the evidence as "historic aerial imagery of the historic Iditarod Trail, the Dickson property, and nearby vicinity" that came to light after a retired civil engineer and land surveyor read about the trial in the newspaper and contacted the State. The State shared the photos with Dickson

and DeFusco within days but did not present the evidence at trial until nearly two months later, after both sides had ample opportunity to examine and prepare to testify about it.

None of these arguments is supported by more than a sentence or two of analysis or by anything other than conclusory allegations of prejudice. We are not persuaded that the superior court abused its discretion in any of the challenged rulings.[43]

E. **We Remand The Attorney's Fees Award For Specific Findings Under Alaska Civil Rule 82(b)(3)(I) And (J).**

Finally, Dickson and DeFusco argue that the superior court abused its discretion in its award to the State of approximately $225,000 in attorney's fees, calculated under the formula of Alaska Civil Rule 82(b)(2) for cases in which the prevailing party at trial recovers no money judgment. They argue that the superior court should have varied from the formula by applying Rule 82(b)(3)(I) and (J). Subsection (I) allows a variance if the award would otherwise be "so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts," and subsection (J) allows a variance to "the extent to which the fees incurred by the prevailing party suggest that they had been influenced by considerations apart from the case at bar, such as a desire to discourage claims by others against the prevailing party."

Dickson and DeFusco relied on subsections (I) and (J), among others, in their opposition to the State's motion for attorney's fees. They pointed to several public

---

[43] Dickson and DeFusco also contend that the superior court "improperly applied the law" when it found their testimony "biased and self-interested." But they also assert that "[a]ll party-witnesses, including DNR's employees, are biased," and their argument is thus that the court should have found both sides' witnesses equally unreliable. "We will grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony." *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009) (citing *Vezey v. Green*, 171 P.3d 1125, 1128-29 (Alaska 2007)). We see no reason to second-guess the trial court's credibility determinations.

statements by representatives of the State, including a slideshow presentation by the Department of Law explaining RS 2477 and the importance to the State of identifying and preserving a system of public rights of way. The presentation noted the recent efforts of DNR and the Department of Law to "further develop[] and refine[] Alaska's R.S. 2477 prosecution strategy, including: careful selection of initial claims to prosecute," and it identified *Dickson v. State* as one of the RS 2477 cases in active litigation. Dickson and DeFusco also cited legislative testimony by a DNR manager and an assistant attorney general; the two men gave the slide presentation to a joint meeting of the House and Senate State Affairs Standing Committees and explained the State's "careful selection of initial claims to prosecute in order to avoid establishing bad case law."

The superior court did not address these arguments in its order granting attorney's fees. After subtracting the cost of unexplained paralegal work from the total fees claimed by the State, the court applied the formula of Rule 82(b)(2) without any variance. Ordinarily our review would stop there. "[A]wards of attorney's fees made pursuant to the schedule set out in Rule 82 are presumptively correct, and the superior court need not make any findings in support of the award."[44] But this is the rare case in which we find we need an explanation of the award in order to aid our appellate review. That something is "presumptively correct" does not mean it is unassailable, but only that the burden — and sometimes a heavier than usual burden — is on the party challenging

---

[44] *Greene v. Tinker*, 332 P.3d 21, 41 (Alaska 2014).

it.[45] We have implied that an attorney's fees award that is presumptively correct may be set aside for "compelling reasons."[46]

Two unique circumstances of this case persuade us that there may be compelling reasons to overcome the award's presumption of correctness. The first is the sheer size of the award; for most private parties an award of over $200,000 would have the deterrent effect addressed by Rule 82(b)(3)(I).[47] The second is the unusual evidence that the State selected and devoted resources to RS 2477 cases like this one that it hoped would be precedential. That is a perfectly reasonable strategy for any potential litigant facing a number of similar claims, but Rule 82(b)(3)(J) recognizes the potential unfairness of imposing the strategy's entire burden on the non-prevailing party in the test case.

We remand the attorney's fees award for the superior court's express consideration of whether Rule 82(b)(3)(I) and (J) justify variance of an award calculated

---

[45] *See, e.g.*, *Wagner v. Wagner*, 386 P.3d 1249, 1253 (Alaska 2017) ("Equal division of marital assets and liabilities is presumptively correct, but the superior court may vary this formula in order to reach an equitable distribution . . . ." (footnote omitted)); *Bromley v. Mitchell*, 902 P.2d 797, 802 (Alaska 1995) ("A domiciliary plaintiff's choice of forum should be considered presumptively correct unless the defendant can demonstrate that the plaintiff's right to choose is outweighed by other factors."); *City of Wasilla v. Wilsonoff*, 698 P.2d 656, 658 (Alaska 1985) ("The party challenging the assessment [for a municipal improvement] bears the burden of overcoming the presumption of correctness.").

[46] *Williams v. Fagnani*, 228 P.3d 71, 77 (Alaska 2010) ("Our review of the record does not show the existence of compelling reasons to overcome the presumption of correctness that is afforded to attorney's fees awards under Rule 82(b).").

[47] *See Bozarth v. Atl. Richfield Oil Co.*, 833 P.2d 2, 5-7 (Alaska 1992) (Matthews, J., dissenting in part) (discussing impact of "financially ruinous" attorney's fees awards on citizens' constitutional right of access to the courts to litigate good-faith claims).

pursuant to the formula of Rule 82(b)(2). The superior court has discretion to decide the issue on the existing record or to request further evidence and argument from the parties.

## V.    CONCLUSION

We AFFIRM the superior court's decision on the merits following trial. We REMAND the superior court's award of attorney's fees for further consideration consistent with this opinion.